IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RHAUNI GREGORY,** | : | |
| **Plaintiff** | : | **Civil No.: 1:09-CV-00780** |
| | : | |
| **v.** | : | |
| | : | |
| **DERRY TOWNSHIP SCHOOL** | : | |
| **DISTRICT; TIMOTHY QUINN;** | : | |
| **MRS. BANDUCCI;** | : | |
| **CINDY GOLDSWORTHY;** | : | |
| **MICHAEL MURPHY;** | : | |
| **DR. PARRISH; TOM FERGUSON;** | : | |
| **and BEULAH CHABAL,** | : | |
| | : | |
| **Defendants** | : | |

## M E M O R A N D U M

In this civil rights action, Plaintiff Rhauni Gregory has brought suit against her former employer, former co-workers, union officials, and the parent of one of her students for alleged violations of 42 U.S.C. §§ 1981 and 1983 based upon her assertion that she was subjected to discriminatory treatment because of her race, which adversely affected the terms and conditions of her employment. Before the court is Defendants Derry Township School District, Timothy Quinn, Cindy Goldsworthy, Michael Murphy, William Parrish, and Beulah Chabal's (collectively the "School District Defendants") motion for judgment on the pleadings, (Doc. 7), which was converted to a motion for summary judgment by order of court on November 4, 2009, (Doc. 18). At issue in the case is the validity of a release signed by Gregory upon her resignation as a teacher from the Derry Township School District ("the District"). On December 1, 2009, the court held an evidentiary hearing on the School District Defendants' motion, and permitted the parties to file

supplemental briefing on the issues raised at that hearing. The motion is now ripe for disposition, and for the reasons that follow it will be granted.

## I.        Facts

The following facts are drawn from the evidentiary hearing held on December 1, 2009, and are construed in the light most favorable to Plaintiff. Gregory is a certified English teacher currently employed by the School District of Lancaster. (Doc. 22, Dec. 1, 2009, Tr. of Proceedings ("Tr.") at 12:3-4; 12:16-17.) Gregory has a Bachelor's Degree from LeMoyne College and a Masters Degree from Syracuse University. (*Id.* at 12:7-8; 12:14-15.)

In February 2004, Gregory was hired by the District as a long term substitute high school English teacher. (*Id.* at 12:21-24.) Subsequently, Gregory was offered a three-year contract as a high school English teacher effective at the beginning of the 2004-2005 school year. (*Id.* at 13:3-6.) Gregory continued to work as a teacher through the expiration of her contract in June of 2007. (*Id.* at 13:7-15.) Throughout the time Gregory was a teacher with the District, she was a member of the Hershey Education Association—the teacher's union. (*Id.* at 13:16-17.)

In December 2006, Gregory was evaluated by Defendant Michael Murphy, the building principal. (*Id.* at 14:11-13.) Gregory's evaluation was not favorable, and she was placed on an intensive assistance track. (*Id.* at 15:25-16:3.) Gregory disagreed with Murphy's assessment that she performed unsatisfactorily, or that she needed to be placed on an intensive assistance track. (*Id.* at 15:13-16:17.) After some back and forth between Gregory's union representatives and the District, a final version of an assistance plan was approved and implemented; no one from the Hershey Education Association or the Pennsylvania State Education Association

("PSEA")—the parent union—voiced any objections to the final plan. (*Id.* at 17:4-7.)

From both parties' perspective the plan did not go well. Gregory contends that the plan became overly oppressive and unrealistic, (*Id.* at 18:10-12), whereas the District takes the position that Gregory simply did not comply with the terms of the assistance plan, (*Id.* at 44:13-14). At some point, Gregory was told that her contract would not be renewed at the end of the 2007 school year, and that she would not be granted tenure. (*See id.* at 34:5-8.) Throughout the spring of 2007, Gregory kept in contact with her local union representatives, specifically Penny Arnold, as well as a representative from the PSEA, Tom Ferguson. Gregory expressed continued frustration with the manner in which the plan was being implemented, and she discussed with Ferguson whether she should resign her employment. (*Id.* at 70:1-71:14.) When it became clear that Gregory would not be granted tenure, and that she had become overwhelmed by the pressure associated with the improvement plan, Gregory's representatives began negotiating with the District to allow her to resign in lieu of termination. (*Id.* at 71:18-24.)

The negotiations centered around the timing of Gregory's resignation, the continuation of her medical benefits, a positive letter of reference, and the immediate cessation of the improvement plan for the remainder of the school year. (*Id.* at 71:18-72:13.) Ultimately, the union negotiated a Separation Agreement and General Release ("Release") and severance package for Gregory in exchange for her resignation. The Release was executed in April 2007. It provided that Gregory would resign her employment effective at the end of June 2007, and in exchange, the District would provide extended health insurance coverage for Gregory and her

3

family through December 31, 2007, or until she found other employment, whichever came first, and a positive letter of reference. (*See id.* at 20:24-21:1.; Doc. 5-2 (Release).) The Release also included the following language releasing all claims against the District and its employees:

> 5. **Release:** In consideration of the monetary benefits extended to Gregory under the terms of this Agreement, benefits to which Gregory acknowledges that she would not otherwise be entitled, Gregory agrees for herself, her heirs, executors, administrators, successors and assigns to forever release and discharge Derry Township and its directors, officers, agents, and employees, past and present, collectively or individually, from any and all claims, demands, causes of actions, losses and expenses of every nature whatsoever, known or unknown, arising out of her employment with Derry Township, along with any claims arising up to and including the date on which this Agreement was executed by the parties.
>
> These claims include, but are not limited to, breach of express or implied contract, intentional or negligent infliction of emotional harm, libel, slander, claims under the Pennsylvania Wage Payment Collection Law, the Fair Labor Standards Act, Title VII of the Civil Rights Act, the Pennsylvania Human Relations Act, the Americans with Disabilities Act, any tort claim, any federal, state or municipal statute or ordinance relating to unlawful discrimination, including any wrongful discharge claim with may be cognizable under the laws of any state.
>
> Gregory and the Union further acknowledge and agree that they will not file any grievances with regard to Gregory's separation, as long as Derry Township complies with the terms of this Agreement.

(Doc. 5-2 (Release) ¶ 5.)   Gregory signed the Release on April 19, 2007.  (*Id.*; Tr. at 21:17-18.)

Gregory contends that notwithstanding the plain language contained in the Release, that she should be permitted to pursue her claims in the instant suit because the Release constitutes an invalid waiver of her federal civil rights, and that

she signed it under extraordinary pressure and duress. According to Gregory, on April 19, 2007, while she was still in her classroom teaching, she received a call from Dr. Timothy Quinn in the superintendent's office stating that he would be over to her classroom to review the Release with her and have her sign it. (Tr. at 24:20-23; 25:10-13.) According to Gregory she took about fifteen minutes to read the Release before she signed it. (*Id.* at 28:6-8.) During that entire time, Dr. Quinn sat next to her. (*Id.*) She asked him questions about the agreement, some of which he did not know how to answer. (*Id.* at 28:14-16; 36:9-10.) However, Quinn assured Gregory that Tom Ferguson had already seen the agreement and approved of its contents. (*Id.* at 23:17-21.) Gregory was unable to articulate at the evidentiary hearing what questions she had about the agreement that went unanswered before she signed it. She stated the following, in response to the court's questions:

> THE COURT: Ms. Gregory, you said that you had some questions about the agreement?
> THE WITNESS: Yes.
> THE COURT: Do you know what those questions were?
> THE WITNESS: I do not remember all the specifics. A lot of it was with the language, the document itself.
> THE COURT: You don't recall what the language was that you had some concerns about?
> THE WITNESS: No. I asked several questions, but I don't remember all of them right now.

(Tr. at 38:20-39:4.)

When asked during the hearing by counsel for the District whether she was told that she was required to sign the agreement that day, Gregory did not provide a specific answer. The following exchange occurred:

> Q: Did Dr. Quinn say, you need to sign this agreement right now or else?
> A: He said, here's the pen. As soon as you sign it, all the hardships that have been placed upon you will

> end; no more observations, no more harassments, no more reports, no more drop-ins, etc., etc.
>
> Q:  Did you say to Dr. Quinn, well, before I sign this, I want to talk to Mr. Ferguson again or one of my building reps?
>
> A:  I had tried to contact Mr. Ferguson in the time for Dr. Quinn to drive over to my classroom, and he never got back to me until the following week.

(*Id.* at 24:24-25:9.)  In response to her own attorney's questioning about why she did not take more time to read the release or consult anyone before she signed it, Gregory stated the following:

> Q:  Okay.  Now is there any reason that you didn't demand when Mr. Quinn [*sic*] was sitting there next to you to, I need to take three days to take this to an attorney to make sure I'm making the right decision here?  Any reason why you didn't say or do anything like that?
>
> A:  I thought I had made the right decision when I contacted Tom Ferguson.  He told me to leave everything to him, he was handling it.  I was not even prepared to represent myself because my only duty at that time was simply to comply with whatever was put before me.

(*Id.* at 30:11-20.)

When asked at the evidentiary hearing whether any of the specific provisions of the Release were unclear to her, Gregory testified each time that the provisions were clear.  (*See id.* at 35:4-36-8.)  It is undisputed that the District performed its obligations under the Release.  Defendant Murphy provided Gregory with a positive letter of reference, and the District continued to provide medical coverage for Gregory and her family until she obtained employment with the School District of Lancaster.  (*Id.* at 26:17-27:7.)  In fact, the District paid in excess of $24,000 in medical bills on Gregory and her family's behalf between the period that

her resignation became effective and the time that she obtained other employment. (*Id.* at 27:8-11.)

## II.      <u>Legal Standard</u>

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Upon such a showing, the burden then shifts to the non-moving party to present "specific facts showing the existence of a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*

*Corp.*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

III.     **Discussion**

On the issue of the validity of the Release, there are no genuine issues of material fact that would preclude the court from ruling on summary judgment. The parties vigorously disagree about whether the Release is a valid waiver, and the interpretation of the events leading to Gregory's resignation, but they do not disagree about the facts underlying the preparation and signing of the Release. Thus, the relevant question is whether, based on the totality of the circumstances, Gregory knowingly and willfully gave up her right to bring the instant lawsuit in exchange for the benefits provided in the Release. Based on a review of the record, the court concludes that she did, and that her federal civil rights claims are barred as a matter of law.

A contract that releases potential federal employment discrimination or, as in this case, federal civil rights claims, is valid if it was knowingly and voluntarily executed. *See Coventry v. U.S. Steel Corp.,* 856 F.2d 514, 522 (3d Cir. 1988), *superseded by statute on other grounds.* To consider whether a release is valid, the

Third Circuit directs courts to consider the totality of the circumstances surrounding its execution, and to do so district courts should consider the following non-exhaustive factors:[1]

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time the plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

*Cirillo v. Arco Chem. Co.,* 862 F.2d 448, 451 (3d Cir. 1988) (citing *Coventry*, 856 F.2d at 523). Courts should also consider "whether there is evidence [that the employer procured the release through] fraud or undue influence, or whether enforcement of the release would be against the public interest." *Cuchara v. Gai-Tronics Corp.*, 129 F. App'x 728, 731 (3d Cir. 2005). The court will address each of these factors, but will save for last the consideration of whether Gregory had sufficient time to review and deliberate about the release before she signed it.

### A.    Clarity and Specificity of the Release Language

The court finds that the release language is clear and unambiguous. It lists specific claims that Gregory would be releasing as well as "any federal, state or

---

[1] The enactment of the Older Workers Benefits Protection Act, 29 U.S.C. § 626(f), rendered the Third Circuit's totality of the circumstances test irrelevant for ADEA purposes. *See Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1539 (3d Cir.1997) ("Congress intended to occupy the area of ADEA releases and, in doing so, to supplant the common law ..."). However, there is no indication that the test is inappropriate in the context of §§ 1981 or 1983 where Congress has not yet codified standards for voluntariness. Therefore, the court will employ the Third Circuit's totality of the circumstances test for the claims brought by Gregory.

municipal statute or ordinance relating to unlawful discrimination, including any wrongful discharge claim with may be cognizable under the laws of any state." (Doc. 5-2 (Release) ¶ 5.)  Gregory acknowledged that she read and signed the agreement, (Tr. 21:10-17; 23:16-17), and that she would be receiving certain "settlement benefits" in exchange for executing the Release, including continued health coverage, as well as a positive letter of reference.  (*Id.* at 23:22-24:8.)  Further, during questioning at the evidentiary hearing Gregory admitted that many of the specific provisions of the agreement are clear and unambiguous.  (*See id.* at 35:7-36:4.)  Although Gregory testified at the hearing that she had "some questions" about the terms of the Release when it was presented to her by Dr. Quinn, when questioned by the court, Gregory could not identify any of the provisions that caused her concern.  (*Id.* at 38:20-39:4.)

Furthermore, the entire Release is only five pages and the section releasing claims comes on the second page of the agreement, and was separately set out from the remainder of the agreement.  *See Cuchara v. Gai-Tronics*, No. 03-6573, 2004 U.S. Dist LEXIS 11224, at * 17 (E.D. Pa. Sep. 8, 2004) (release containing waiver language in a separate paragraph effectively communicated to an employee which claims he is waiving), *aff'd* 129 Fed. App'x 728 (3d Cir. 2005).  Additionally, the fact that the wavier sweeps broadly and releases all potential claims does not make it unclear or ambiguous.  *See e.g. Easton v. Bristol-Myers Squibb Co.,* 289 F. Supp. 2d 604, 610 (E.D. Pa. 2003) ("[T]he mere fact that [a release's] language may be boilerplate, i.e., that it was not specifically drafted with [the employee's] claims in mind, does not detract from its legal significance.")  Based on a plain reading of the

Release, as well as Gregory's response to questioning at the evidentiary hearing, the court concludes that the Release's waiver language was clear and unambiguous.

## B. Education and Experience

Based on the record, the court concludes that Gregory possessed the requisite level of education and experience to understand the Release. Gregory has a bachelor's degree in English and a master's degree from Syracuse University. (Tr. at 12:5-15.) Furthermore, she is a certified high school English teacher in both New York and Pennsylvania. (*Id.* at 12:18-20.) Given the clear and unambiguous nature of the release, Gregory clearly possessed the requisite education and experience to understand its terms.

## C. Whether Gregory knew or should have known her rights

It is clear from the testimony presented at the hearing that Gregory knew her options at the time she signed the Release. She had already consented to the improvement plan which was negotiated with the assistance of her labor union. (*Id.* at 16:22-25). Furthermore, after that agreement was in place, it was explained to Gregory by her union representative that she could either follow the plan, or not follow it and be insubordinate. (*Id.* at 67: 16-17.) After it became clear that the plan was not going well, Gregory discussed the possibility of filing a grievance through the union. (*Id.* at 68:17-18.) Finally, it is undisputed that Gregory discussed the possibility that race was a motivating factor in the District's decision to impose an improvement plan. (*Id.* at 84:17-24.) Accordingly, it is clear from the record that Gregory was aware of her rights, as well as the possibility of legal claims based on discrimination, prior to signing the Release.

**D.    Opportunity to consult with legal counsel**

Gregory had the right to consult with legal counsel, and she was not denied the opportunity to do so. During his testimony, Tom Ferguson explained that it is "standard procedure" for PSEA to offer an employee who is likely to be terminated, or offered the option to resign in lieu of termination, the opportunity to meet with legal counsel. (*Id.* at 68:23-69:4.) Furthermore, Gregory acknowledged that she spoke with PSEA's legal counsel before making her decision to resign, and at some point prior to signing the Release to discuss "how this would go, the process, [and] issues of insurance coverage." (*Id.* at 18:1-7.) Thus, it is clear that Gregory had the opportunity to consult with legal counsel about her situation before she decided to resign her employment.

It is true that Gregory did not consult with counsel immediately before signing the release as only fifteen minutes passed between the time she was presented with the Release and her actual signing of the document. Furthermore, there is no indication that anyone from the District encouraged Gregory to seek legal counsel to review the Release before they presented it to her. Nonetheless, Gregory did consult with PSEA's legal counsel at least once prior to her decision to resign, and was afforded an opportunity to consult with counsel throughout the process. Furthermore, as the court discusses in Part III.E., *infra*, the terms of the Release were negotiated by her union representatives and approved by them prior to her signing it; in the court's mind, this mitigates any prejudice that she faced by not having counsel present while she reviewed the Release.

12

**E.   Opportunity to negotiate the terms of the release**

It is clear from a review of the record that Gregory relied on her union representatives to negotiate on her behalf. Of course, it is equally clear that she is now unhappy with those negotiations. Nonetheless, Gregory testified that although she did not know the "legal ins and outs," that Mr. Ferguson was doing the negotiating for her. (*Id.* at 36:21-23.) Gregory also stated that she was aware that Ferguson had reviewed the Release before she signed it. (*Id.* at 37:24-38:1.)

This is consistent with Ferguson's testimony at the evidentiary hearing. Ferguson explained that he kept in mind four issues that were important to Gregory while he was negotiating with the District:

> [W]e knew that continued health insurance was a big issue for her. We also knew that a positive recommendation, not a neutral, but a positive recommendation from the building principal was a big issue. Thirdly, continuing in her position until the end of the school year was a significant component also. The fourth thing was that the improvement plan, or the intensive assistance plan, whatever it's being called, was, that scrutiny was to stop, that there would be no more administering of that plan as it was written.

(Tr. at 71:23-72:8.) Ferguson testified that a draft of the Release was provided to him by the solicitor for the District, that he looked through it and discussed it with the Hershey Education Association president, and "sent it back with some verbiage change recommendations." (*Id.* at 72:18-22.) The agreement then came back to Ferguson and once he assured himself that it "satisfied the needs that Ms. Gregory had indicated . . . were important" he told the District that it was "sufficient in terms of satisfying those needs." (*Id.* at 72:23-73:1.) It is clear from this testimony that the Release was not unilaterally drafted; instead, Gregory, through her union representatives, negotiated the terms and language of the Release, and Gregory's

13

union did not approve the Release until it satisfied all of her identified areas of concern.

It is clear from the record that Gregory is now unhappy with the representation that she received from her union representatives and Tom Ferguson in particular. She feels that they were not responsive to her requests for assistance, did not take time to adequately explain her options, did not pursue any grievances, and were more interested in keeping peace with the District than advocating on her behalf. These complaints may very well be legitimate, but they have no bearing on the issues presently before the court. Gregory has not sued her union representatives for a breach of their fiduciary duties; instead she has sued them and the District for an alleged violation of her federal civil rights. That Gregory is now unhappy with the representation she received does not nullify the fact that her union representatives were instrumental in negotiating the terms of her resignation. There is simply no evidence before the court suggesting the union's negotiation on Gregory's behalf should be discounted in weighing whether Gregory knowingly and voluntarily waived her right to bring federal civil rights claims. Gregory herself said at the hearing that she relied on the union to negotiate for her. (Tr. at 30:11-20.) Having made that choice, Gregory cannot now say that the union's negotiation of the agreement cannot be imputed to her. Accordingly, the court finds that Gregory, through her representatives, had an opportunity to negotiate the terms of the Release.

## F.   Consideration in return for the waiver

According to the District superintendent, a teacher who resigns her employment with the District is not provided with continuing health coverage following the date of separation. (*Id.* at 5:21-6:3.) Here, despite resigning, Gregory

received, in exchange for her agreement to release the District from all liability arising from her employment, continued health coverage for her and her family until at least October 2007 when she received health insurance coverage from her new employer. (*Id.* at 26:20-27:7.) Furthermore, it is undisputed that the District paid in excess of $24,000 in claims to cover medical procedures for Gregory and her family during this time, and that they would have continued to provide coverage until December 31, 2007 had she not been provided with coverage elsewhere. (*Id.* at 27:8-11.) Gregory was also provided with a positive letter of reference. (*Id.* 45:8-13.) Thus, Gregory received, as a matter of law, adequate consideration in exchange for releasing potential claims.

### G.    Amount of time that Gregory had for deliberation before she signed the Release

All of the preceding factors favor the conclusion that Gregory knowingly and voluntarily signed the Release waiving the federal claims that she seeks to bring in this lawsuit. However, the circumstances behind Gregory's signing of the Release are more troubling, and it is here that the parties spend most of their time. In fact, this is the only factor that Plaintiff's counsel focuses on at all. It is clear from the record that Gregory did not take very much time to review the release before she signed it. At most, she had it for fifteen minutes. (Tr. at 28:6-8.) The question is whether she made the decision to review it for such a short period of time fully understanding what it was, or whether the District hurriedly required her to sign it without her complete understanding. Based on a review of the totality of the circumstances, the court finds that, although brief, the amount of time Gregory had to review the Release was sufficient.

Gregory testified that on April 19, 2007, she was called by Dr. Quinn at the end of a school day, and was told that he would be there within minutes for her to review the Release and sign it. (*Id.* at 24:20-23.) No more than fifteen minutes after she received this call, Dr. Quinn showed up with the Release and waited next to her while she reviewed it. (*Id.*) By Gregory's testimony, there was at best fifteen minutes between the time that she was presented the Release and the time that she signed it. (*Id.* at 28:6-8.). When asked during the hearing whether Dr. Quinn told her that she needed to sign the Release that day, the following exchange occurred:

> A:   He said, here's the pen. As soon as you sign it, all the hardships that have been placed upon you will end; no more observations, no more harassments, no more reports, no more drop-ins, etc., etc.
>
> Q:   Did you say to Dr. Quinn, well, before I sign this, I want to talk to Mr. Ferguson again or one of my building reps?
>
> A:   I had tried to contact Mr. Ferguson in the time for Dr. Quinn to drive over to my classroom, and he never got back to me until the following week.
>
> Q:   How long did that – from the time you spoke to Mr. Quinn [*sic*] to say that he was coming to bring this document to you, until he actually got there, how long was that?
>
> A:   Ten or fifteen minutes.
>
> Q:   So you waited 10 or 15 minutes to hear from Mr. Ferguson, and when you didn't hear from anybody, you decided just to sign the agreement?
>
> A:   I didn't just decide. As I said, this was after months and months after a great deal of pressure from many sides. . . . And by the time this got to me, I didn't know what else to do. I had tried to contact Mr. Ferguson prior to this day. And, again, he had not returned any calls.

(Tr. at 25:1-25.) Furthermore, when questioned by her own attorney about whether she had sufficient time to review the Release, the following exchange occurred:

> Q:   Okay. Now is there any reason that you didn't demand when Mr. Quinn [*sic*] was sitting there next to you to, I need to take three days to take this to an attorney

16

> to make sure I'm making the right decision here?  Any
> reason why you didn't say or do anything like that?
> A:      I thought I had made the right decision when I
> contacted Tom Ferguson.  He told me to leave everything
> to him, he was handling it.  I was not even prepared to
> represent myself because my only duty at that time was
> simply to comply with whatever was put before me.

(*Id.* at 30:11-20.)  The exchange between Gregory and her attorney continued:

> Q:      Were you given amply opportunity to review all of
> the provisions of the agreement and fully understood them
> at the time you signed?
> A:      I only was able to ask questions while Mr. Quinn
> [*sic*] waited.

(*Id.* at 31:9-12.)

The court is troubled by the manner in which the Release was presented to Gregory, and that she was not affirmatively encouraged by Dr. Quinn to take it home to think about it before she signed it.  Nonetheless, despite the quick turnaround from the time that Gregory was presented with the Release and the time she signed it, there is nothing in Gregory's testimony that suggests that her signature was not knowing and voluntary.  Gregory's testimony demonstrates that she did not necessarily feel pressure at the time she signed the Release, but rather, she was under pressure from the stress and hardship of her employment, and she was relying on Tom Ferguson to represent her interests.

Viewed in isolation, the short period of time Gregory saw the actual release was an insufficient amount of time for her to make an informed decision to waive her rights in exchange for the benefits being offered.  However, the court cannot view this one factor in isolation from the rest.  It is clear that Gregory's union representatives negotiated the terms of the Release with the District, and that they did not sign off on it until it satisfied all of the needs expressed by Gregory.

17

Furthermore, Gregory's only criticism about the manner in which the Release was presented is that Dr. Quinn could not answer the questions she had about some of the language contained in it; however, when asked by the court what language concerned her, Gregory could not provide a specific answer and stated: "I do not remember all the specifics," and "I asked several questions, but I don't remember all of them right now." (Tr. at 38:20-39:4.) The fact that the specifics of the Release were negotiated by Gregory's representatives, coupled with the fact that she could not articulate what troubled her about the Release, leads the court to conclude that the amount of time that she actually saw the document, despite its brevity, was sufficient to allow her to understand it and its importance.

### H.     Coercion or duress

Gregory also suggests that she signed the Release under duress or coercion. Specifically, she states that she signed the agreement because she "received so much pressure," "was worn down," and that she "just didn't know what else to do." (Tr. at 32:16-18.) "Under Pennsylvania law, absent a threat of actual bodily harm, there can be no claim of duress 'where the contracting party is free to consult with counsel.'" *Cuchara v. Gai-Tronics Corp.*, 129 F. Appx. 728, 731 (3d Cir. 2005) (quoting *Carrier v. Wm. Penn. Broad. Co.,* 233 A.2d 519, 521 (Pa. 1967)). Gregory acknowledged that she was not threatened with physical harm by anyone to coerce her into signing the Release. (Tr. at 26: 9-16.) Moreover, there is no indication in the record that Gregory was not free to consult with counsel about the specifics of the Release. She had previously spoken to PSEA's counsel about certain aspects of her departure, and the Release was reviewed by representatives from her

union. (*Id.* at 18:1-7; 72:18-73:1.) Viewed as a whole, there is insufficient evidence of undue influence, coercion, or duress under the facts in the record.[2]

**IV.**      <u>**Conclusion**</u>

The court's analysis of the foregoing factors and the circumstances surrounding Gregory's Release leads the court to conclude that she knowingly and voluntarily waived all of the claims she seeks to bring in this lawsuit. Certainly, the claims in this case are covered by the breadth of the wavier. The release was clear and unambiguous on its face and Gregory is highly educated. She was apprised of her right to grieve the actions taken by the District, and even discussed her belief that racial bias played a role in some of the District's decisions, thus, demonstrating that she was aware of her various rights before she waived them. Through her union representatives, she had an opportunity to negotiate the terms of the agreement, and consult with counsel about her decision making. She also received adequate consideration for waiving her right to bring this lawsuit by the continuation of her medical benefits, a positive letter of reference, and the immediate cessation of the improvement plan she found to be onerous. Although Gregory took only fifteen minutes to review the Release before she signed it, the court concludes that she signed it knowingly and voluntarily.

That Gregory is now unhappy about the fact that she signed the Release does not mean she was unaware of what she was doing at the time she made the decision to resign. Gregory has come forward with no evidence that would lead the

---

[2]Although the parties did not brief the issue, the court sees no reason why enforcement of the Release would contravene the public interest.

court to conclude that her signature on the Release was anything other than her voluntary decision to end a relationship with the District that she found to be increasingly stressful and acrimonious. By signing the Release and obtaining the consideration contained therein, Gregory chose to forego the rights she seeks to enforce in this lawsuit. Accordingly, the court concludes that Defendants are entitled to summary judgement.

The court will also dismiss this case against the two remaining Defendants who were not parties to the motion for summary judgment—Tom Ferguson and Mrs. Banducci—because it is clear from the docket that these individuals were never served. This case was originally filed on April 23, 2009. (Doc. 1.) Pursuant to Federal Rule of Civil Procedure 4(m), Gregory had until August 21, 2009, to serve the complaint. No proof of service or waiver of service has ever been filed as to Defendants Ferguson or Banducci. Accordingly, the court will *sua sponte* dismiss Plaintiff's complaint without prejudice as to these individuals. The court will issue an appropriate order.

s/Sylvia H. Rambo
United States District Judge

Dated: January 11, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RHAUNI GREGORY,                          :
                                         :
            Plaintiff                    :      Civil No.: 1:09-CV-00780
                                         :
      v.                                 :
                                         :
DERRY TOWNSHIP SCHOOL                    :
DISTRICT; TIMOTHY QUINN;                 :
MRS. BANDUCCI;                           :
CINDY GOLDSWORTHY;                       :
MICHAEL MURPHY;                          :
DR. PARRISH; TOM FERGUSON;               :
and BEULAH CHABAL,                       :
                                         :
            Defendants                   :


**O R D E R**

In accordance with the accompanying memorandum of law, **IT IS
HEREBY ORDERED THAT** Defendants Derry Township School District, Timothy
Quinn, Cindy Goldsworthy, Michael Murphy, William Parrish, and Beulah Chabal's
motion for judgment on the pleadings, (Doc. 7), converted by the court to a motion
for summary judgment, (*see* Doc. 18), is **GRANTED.** The clerk of court shall enter
judgment for these Defendants against Plaintiff.

**IT IS FURTHER ORDERED THAT** Plaintiff's complaint is
dismissed without prejudice as to Defendants Mrs. Banducci and Tom Ferguson
because Plaintiff has failed to timely serve the complaint against these individuals.
The clerk of court shall close the case.

                                    s/Sylvia H. Rambo
                                    United States District Judge

Dated: January 11, 2010.